MURRAY   CITY   v.   INDUSTRIAL   COMMISSION   OF UTAH.

No. 3372.    Decided July 31, 1919.    (183 Pac. 331.)

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FINDINGS OF COMMISSION—EVIDENCE OF INJURY—SUFFICIENCY.    Findings of the Industrial Commission that a city employé petitioning for compensation was injured in the course of his employment, and that his injury by a slight blow on the neck with a shovel handle was the immediate cause of a paralytic stroke following shortly after the accident *held* supported by evidence given by the attending physician.[1]

Appeal from District Court, Third District, Salt Lake County; *P. C. Evans,* Judge.

Action by Murray City against the Industrial Commission of Utah, to set aside its award under the Workmen's Compensation Act.    From a judgment or order for plaintiff vacating and setting aside the award, the Commission appeals.

REVERSED, and cause remanded with directions to set aside the order and judgment and to dismiss the complaint.

*Dan B. Shields,* Atty. Gen., and *H. Van Dam, Jr.,* Asst. Atty. Gen., for appellant.

---

[1] Citing *Industrial Com.* v. *Evans,* 52 Utah, 394, 174 Pac. 825; *Garfield Smelting Co.* v. *Industrial Com.,* 53 Utah, 133, 178 Pac. 57.

*D. W. Moffat* of Murray, for respondent.

GIDEON, J.

It is admitted that the plaintiff, Murray City, as an employer, is subject to the provisions of the act of the Legislature commonly known as the Industrial Commission Act.   It appears that on or about August 25, 1917, one David Hazeldine was employed by the plaintiff city, and was at that date assisting in loading with a shovel slag upon a wagon.   Charles White, a teamster, in leveling the slag thrown upon the wagon, while in the act of bringing back his shovel, struck Hazeldine a very slight blow on the neck with one end of the shovel handle.   A state of paralysis followed, which particularly affected the left side of the body.   A petition was filed by Hazeldine with the defendant commission praying for such relief as he might be entitled to receive.   Hearing was had, and an order made by the commission, directing that the plaintiff, Murray City, pay to the claimant, Hazeldine, the sum of eight dollars and seventy-three cents per week beginning September 5, 1917, and to continue so long as the disability lasts.   Thereafter, on petition of Murray City, a rehearing was granted and additional testimony taken, whereupon the commission adhered to and reaffirmed its former decision.   The plaintiff city, being dissatisfied with the award of the commission, in pursuance of Comp. Laws Utah 1917, section 3087, being section 27 of the original act of 1917, filed its complaint in the district court of Salt Lake county, asking that said award be set aside, vacated, or amended, on the ground that the decision was unreasonable and unlawful, and that said decision was not supported by evidence, but was contrary to the evidence, and that the applicant did not receive a personal injury by accident arising out of and in the course of his employment.   To that complaint the commission answered, making certain admissions and denials.   Among other things it was alleged "that the court is without jurisdiction to hear evidence in the case, and that its jurisdiction is limited to reviewing the record made by the commission."   To

the answer was attached and filed with the clerk of the court a copy of the proceedings and testimony taken before the commission. The trial court seems to have treated the answer as a demurrer, and, after argument, overruled the same, entered judgment in favor of the plaintiff city vacating and setting aside the award made by the defendant commission. From that judgment or order the commission appeals to this court.

There is no dispute that the petitioner Hazeldine was, on the date mentioned, in the employ of the city. Neither is there any dispute that he received a slight blow in the course of his employment from the end of the shovel handle in the hands of the witness White, either by Hazeldine walking against it or by White pulling it back in leveling the slag upon his wagon. It is also conceded that it was not such a blow or contact as to cause any abrasion or make any mark or bruise upon the skin. Immediately following this, however, Hazeldine became sick; was given some assistance by his fellow workmen; was later, during the same afternoon, taken to the physician's office. On the following morning paralysis had developed so as to be, as stated by the doctor, complete.

The question for determination by this court is: Is there any substantial evidence in the record to support the finding of the commission that the injury resulted from an accident received while in the course of employment?

It is conceded in the argument of counsel for Murray City that if the evidence of the physician connects the stroke of paralysis with the injury the decision of the Industrial Commission should be sustained. It is likewise conceded by the Attorney General, appearing for the commission, that if the award can be supported such support must be found in the testimony of the attending physician. Dr. Rothwell, as his is the only testimony that connects the paralysis with the accident. We think it advisable, therefore, to set out all of the testimony given by the physician bearing upon or material to the finding of the commission on that point. It is as follows:

"Q. Do you know anything as to an injury sustained by him on or about the 17th day of August, 1917? A. Yes. Q. State, Doctor, what the nature of it was and the condition in which you found him? A. Mr. Hazeldine was brought to my office in a buggy on that day by two other men, I believe, and they told me at that time that he had been struck in the neck with the handle, I believe, of a shovel; and at that time he had been struck, I believe, in the left side of his neck, and his head was turned very far to that side. On examination at that time he didn't show any bruise or contusion at the point of injury, and I heard from him the next day. * * * I went down to see him and at the time he had a left-sided paralysis. I kept him in bed for a long time with that, and it is gradually getting better. * * * Q. Well, Doctor, was there any contusion or mark around the area of the injury developed subsequent to the first examination? A. No, sir. Q. Did you connect, in any way, the injury with his stroke of paralysis? A. Well, in this way: Of course, as far as the tap on the neck went, that would not give him the paralysis on the same side. His injury has got to be here (pointing to the base of the skull), but the way I look at Mr. Hazeldine's case, he doubtless, was carrying at that time a high-blood pressure, as tests with the instruments have since shown, and I have no doubt he was at the time of his injury, and he was working for the city on a hot August day, in a black slag dump, just about as hot a condition as you could get a man to work in. In fact, the heat was terrific, and that would tend to make his pressure higher. He was struck in the neck, and it was started by his being struck; and he, I suppose, had jumped back, and that is when the thing happened. That is, started in in scaring him a little bit, in connection with the already high-blood pressure, and augmented it, and he burst a blood vessel in the right side of the brain. Q. And you call this a stroke of apoplexy, or how do you designate it? A. Yes; a stroke of paralysis. Q. Now, do you say that this accident—while it in itself was not wholly the cause of the stroke—but would you say that it was the proximate cause? A. I would say so, Mr. Nebeker. As I would look at it, the condition is much the same as if we had a loaded cannon in this room and everything ready to be fired off. Let some one touch it off as the accident touched his off, and the whole character is changed. Q. Now, do you make any connection or relation with the fact of him being hit on the left side of the neck with his paralysis on the left side? A. No; nothing whatever. Q. Is it not a fact, Doctor, that an injury on the one side would more likely have an effect on the opposite side? A. Yes, absolutely. The only way it could happen to give him the paralysis would be to give him a fracture of the vertebræ in the neck. Then

it would cross over, for they cross over right at the base of the brain. * * * Q. Now, Doctor, how soon after receiving that accident would you say from your experience as a physician that this stroke followed the accident? A. Well, now, I saw him, as I remember, around 5 o'clock in the afternoon, and he had it the next morning. It was complete the next morning. It was not complete that afternoon. Of course these things all depend on the size of the vessel that bursts. If it is a very small vessel it takes a long time to form a clot in the brain to destroy the nerve centers; while a large vessel can destroy it immediately in such a manner as to cause instant death. Q. Could you tell at your first examination, at the time he was brought to your office immediately following the accident—did you determine at that time that he was suffering from a stroke? A. No; he was not. He was suffering from what we call shock, but it had not made itself evident as paralysis. Q. Is there any evidence in your mind that the shock received from the accident was the proximate cause of this stroke, or—. A. Well let me see if my idea of the proximate cause is the same as yours. Q. Would it have happened if the accident had not been sustained? A. Perhaps. As I say, that blood pressure was there, and everything was there to cause a rupture of the blood vessel, but whether or not it would ever have ruptured of its own accord no one can tell. Q. You believe, then, that the accident would aggravate or accelerate the process of the action? A. Yes, sir. Q. Did he sustain what you would call a severe stroke, to clear up as quickly as it has, or a light stroke? A. Well, rather a light stroke, to clear up as quickly as it has."

The commission made findings, and from such findings deduced the following conclusion:

"In view of the extreme hot weather, age of the applicant, and the obvious susceptibility of applicant to suffer a paralytic stroke at the time of the accident, the fact that no evidence of sickness or distress was apparent immediately before the blow, that a strange feeling, sickness, and a paralytic stroke developed in usual time immediately following the blow, it is reasonable to conclude that the blow from the shovel, received accidentally and arising out of and in the course of his employment by the defendant corporation, was the proximate cause of the disability suffered by applicant, and an award of compensation should be made accordingly."

It is the contention of Murray City that there is nothing in the testimony of the physician to support the finding that Hazeldine was injured while in the course of his employment,

and that, if injured, then the slight stroke which he received could not have produced the paralytic condition that followed.

As indicated above, the only question before this court for determination is whether the above testimony of the physician is sufficient to support the commission's findings. Without attempting to analyze in detail or set forth the deductions and conclusions that might be legally or logically drawn from the physician's testimony, we remark that we have no hesitancy in holding that there was testimony before the commission to support its findings, both that the applicant (petitioner) was injured in the course of his employment, and that such injury was the immediate cause of the paralytic stroke following shortly after the accident or injury. The following authorities support the conclusion reached: *Honnold, Workmen's Comp.* section 98; *La Veck* v. *Parke, Davis Co.*, 190 Mich. 604, 157 N. W. 72, L. R. A. 1916D, 1277; *Crowley* v. *City of Lowell*, 223 Mass. 288, 111 N. E. 786. Other phases of the Industrial Commission Act have been considered by this court in two cases, namely *Industrial Co.* v. *Evans*, 52 Utah, 394, 174 Pac. 825; *Garfield Smelting Co.* v. *Industrial Com.*, 53 Utah, 133, 178 Pac. 57.

It follows from the foregoing that the district court erred in entering judgment setting aside the award of the commission. The judgment of the lower court is therefore reversed, and the cause is remanded to the district court of Salt Lake county, with directions to set aside its order and judgment and to dismiss the complaint. Appellant to recover costs.

CORFMAN, C. J., and FRICK, WEBER, and THURMAN, JJ., concur.